UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
JACOB BINSON and BINSON PAWNBROKERS, :
INC.,                                    :
                                         :
                    Plaintiffs,          :
                                         :
        - against -                      :          **OPINION AND ORDER**
                                         :          12 Civ. 4871 (ER)
MAX KAHAN, INC.,                         :
                                         :
                    Defendant.           :
----------------------------------------------------------------x

Ramos, D.J.:

     Plaintiffs Jacob Binson ("Binson") and Binson Pawnbrokers, Inc. ("Binson Pawnbrokers") (collectively, "Plaintiffs") have brought suit claiming that Defendant Max Kahan, Inc. ("Defendant"), a gold refinery business, wrongfully sold gold belonging to Plaintiffs without their permission. Compl., Doc. 1. According to Plaintiffs, they had earlier provided 1,329.58 ounces of fine gold and silver to Defendant for refining, and instructed Defendant on November 5, 2010 to sell only 93.3 ounces of gold. Defendant, on the other hand, claims that at Plaintiffs' request, it sold the entire balance of the gold—nearly 1,300 ounces worth—on November 5, 2010. The instant motion concerns the lost or destroyed original invoice for the November 5, 2010 transaction, which Defendant claims to have sent to Plaintiffs via facsimile on November 8, 2010 (the "Invoice"). Pending before the Court is Defendant's motion pursuant to Rule 37 of the Federal Rules of Civil Procedure and the Court's inherent powers for an adverse inference instruction[1] relating to the alleged destruction of the Invoice and Plaintiffs' failure to search for or produce certain business records. Doc. 19. Defendant also seeks reimbursement for expenses and attorneys' fees. For the reasons set forth below, the Court finds that it cannot decide the motion based on the current state of the record and reserves judgment on the motion.

---

[1] The parties have not made a jury demand in the instant litigation.

## I.   Background

a)   *Plaintiffs' Version*

According to the Complaint, Plaintiffs are pawnbrokers and jewelers and regularly did business with Defendant, a gold refinery business.  Compl. ¶¶ 2-4.  Plaintiffs allege that in September 2010, they transferred 1,329.58 ounces of fine gold and silver to Defendant to be refined at the direction of the Plaintiffs.  *Id.* ¶ 5.   According to Plaintiffs, they provided Defendant with instructions to sell 40 ounces of gold on September 20, 2010.  *Id.* ¶ 6; Supp. Schwed Decl. Ex. H (Binson Dep. Tr. 120:19 – 120:21, 131:24 – 132:3, May 19, 2013), Doc. 23 (hereinafter "Binson Tr.").  On November 5, 2010, Binson told Harold Weinstein ("Weinstein"), a Vice President of Max Kahan, Inc., that he needed $130,000, and asked if Defendant could advance him the money from the anticipated proceeds of the sale of the gold.  Binson Tr. 120:20-21, 132:3.  Weinstein declined the request and Binson then instructed him to sell an amount of the gold that would yield $130,000—which at that time would have been approximately 93.3 ounces of gold.  *Id.* at 92:24 – 93:9, 120:16 – 121:3, 127:10 – 127:13; Compl. ¶ 7.  Defendant then made the advance payment of $130,000 to Plaintiffs on either November 5 or November 8, 2010.  Binson Tr. 118:19 – 118:20, 127:24 – 128:15.  Plaintiffs claim that as a result of the above-mentioned sales, 1,186.3 ounces of gold should have remained in Defendant's possession.  Compl. ¶ 8.  Plaintiffs state that they did not provide any instructions to sell the remaining gold and silver.  *Id.*

On August 10, 2011, Binson visited Defendant's offices and requested the return of the gold and silver.  *Id.* ¶ 9.  According to Plaintiffs, Defendant refused to return the gold and silver and instead wired Plaintiffs $1,653,100 on August 11, 2011.  That amount reflected the proceeds of the September 2010 sale and the sale of the remainder of the gold at its November 2010 price.

2

*Id.*  Plaintiffs argue that they should have received $2,123,477, representing the proceeds from the sale of the remainder of the gold at its August 2011 price.[2]  *Id.*  Plaintiffs therefore claim that they are owed $470,377, the difference between the value of the gold on November 2010 and August 2011, as well as the silver, which was not returned to them.  *Id.*

On August 12, 2011, Binson sent Weinstein an email stating that Defendant owed Plaintiffs the disputed amount, and that Plaintiffs would have "no choice" but to file a lawsuit if Defendant did not make this payment.  Schwed Decl. Ex. D, Doc. 21.  Plaintiffs ultimately filed the Complaint in the instant action on June 21, 2012.  *See* Compl.

b)  *Defendant's Version*

Defendant's account of the course of dealings is markedly different.  Defendant claims that on July 22, 2010, Plaintiffs brought 2,393.6 ounces of scrap gold to Defendant, which Defendant melted into 1,379.76 ounces of fine gold that day at Plaintiffs' request.  Answer ¶ 4, Doc. 8; Weinstein Aff. ¶ 2, Doc. 20.  According to Defendant, at Plaintiffs' express request, it sold 40 ounces of gold on September 20, 2010, and subsequently sold the balance of the gold on November 5, 2010.  *Id.*; Weinstein Aff. ¶ 4.  Though the Invoice for the sale of the gold was prepared that day, a Friday, it was not sent to Plaintiffs until Monday, November 8, 2010, because Defendant's office closes early on Fridays.  *Id.*

Defendant claims that on November 8, Binson called Defendant to request a check in the amount of $130,000 as partial payment for the amount owed under the November 5, 2010 transaction.  *Id.*  Defendant further alleges that it sent $130,000 to Binson Pawnbrokers via wire transfer on that very day.  Answer ¶ 4.  According to Defendant, at 11:04 a.m. on November 8,

---

[2] According to Defendant, on August 10, 2011, the price of gold reached $1,790 per ounce, which was slightly below its all-time high.  Def. Mem. L. 3, Doc. 22.  By contrast, the price of gold on November 5, 2010 was $1,393 per ounce.  *Id.*

2010, it also sent the Invoice to Plaintiffs' office via facsimile.  *Id.*  During discovery, Defendant produced its telephone records for November 8, 2010, which appear to reflect the transmission of a facsimile to Binson Pawnbrokers at 11:04:50 a.m. on that date.  *See* Weinstein Aff. Ex. B.

The invoice, which is printed on Defendant's letterhead and addressed to Binson Pawnbrokers, is dated November 5, 2010.  *See* Weinstein Aff. Ex. A.  In the "Description" column, the invoice reflects in typed lettering the sale of 40 ounces of gold on September 20, 2010, and of 1,279.76 ounces of gold on November 5, 2010.  *Id.*  A handwritten notation towards the bottom of the "Description" column indicates the November 2010 advance made to Binson: "11/8  $130,000."  *Id.*  The invoice also states that the gold was sold at a price of $1,393.30, and that the total amount for the transaction was $1,783,100.  *Id.*[3]

According to Weinstein, Binson initially asked him to wire the balance of the funds to a Swiss bank account.  Weinstein Aff. ¶ 4 n.1.  Weinstein told him, as he had on previous occasions in response to similar requests, that he could not wire the funds to such accounts.  *Id.*  Binson then asked that Defendant hold onto the balance of the funds until further instruction.  *Id.* ¶ 4.[4]  Weinstein had numerous conversations with Binson over the next eight months and repeatedly asked if Defendant should wire the money to Plaintiffs.  *Id.* ¶ 5.

---

[3] Defendant has provided two versions of the Invoice in connection with the instant motion:  a copy of the Invoice from its records, and a copy of the Invoice produced by Plaintiffs in response to Defendant's First Request for the Production of Documents.  *See* Weinstein Aff. Ex. A and Schwed Decl. Ex. D, respectively.  Defendant argues that the version of the invoice produced by Plaintiffs "appears to have been manipulated," in that the very top of the document, where the fax time stamp would ordinarily appear, was not copied.

The Court notes that, while Defendant has provided telephone records that are consistent with its assertion that the Invoice was sent, Defendant has not produced a fax confirmation sheet reflecting the successful transmission of the Invoice, which would ordinarily be created when a fax is sent.

[4] No explanation is provided as to why Binson would ask Weinstein to "hold on" to an amount in excess of $1.6 million, as to which there appears to be no dispute that he was entitled.

Defendant claims that on August 10, 2011, Binson called Weinstein and instructed him to sell the balance of the gold, and when Weinstein reminded him that Binson had instructed the gold be sold in November 2010, Binson denied having previously given this instruction.  *Id.* ¶ 6.[5] Defendant then "promptly wired" to Plaintiffs the balance of the funds:  the sum of $1,653,100. *Id.*[6]

## II.   Plaintiffs' Response to Defendant's Request for Production of Documents

Central to this dispute is the issue of whether Plaintiffs instructed Defendant in November 2010 to sell the remainder of the gold in Defendant's possession.  In particular, Defendant argues that the Invoice—and specifically, "the fax information on top of the original [November 5, 2010] Invoice"—would "conclusively establish" that Binson received the Invoice on November 8, 2010, and was therefore on notice that all of the gold Binson provided Defendant was sold in two tranches—in September and November 2010.  Def. Mem. L. 1. Plaintiffs deny that they provided the instruction to sell the remainder of the gold on November 5, 2010, and vigorously deny that they received on November 8, 2010 any invoice reflecting the sale of the remainder of the gold in that month.

On October 8, 2012, Defendant served upon Plaintiffs its First Request for the Production of Documents (the "Document Request").  Schwed Decl. ¶ 6.  On December 15, 2012, Plaintiffs responded to the Document Request and produced three documents.  *Id.* ¶ 9.  Plaintiffs answered several of Defendant's document requests with the statement, "We have been unable to locate any documents responsive to this request.  If same are found during the course of discovery same

---

[5] While Weinstein stated in his affirmation that his communication with Binson on August 10, 2011 was by phone, Defendant has pleaded that Binson appeared at Defendant's office on that date to request the return of the gold. Answer ¶ 6.

[6] Binson, on the other hand, claims that he always drew a check for the proceeds of a sale when conducting business with Defendant, and that Defendant never held a cash balance for him.  Binson Aff. ¶ 14, Doc. 25.

will be provided." *See* Schwed Decl. Ex. D.  As discussed above, one of the three documents produced by Plaintiffs on December 15, 2012 was a copy of the invoice reflecting the November 5, 2010 sale of the remainder of the gold.

On January 3, 2013, Nathan Schwed ("Mr. Schwed"), counsel for Defendant, conferred with Plaintiffs' counsel, Frank Uzzi ("Mr. Uzzi").  Schwed Decl. ¶ 10.  According to Mr. Schwed, Mr. Uzzi advised that Binson did not believe that any other responsive documents existed because the parties had traditionally conducted business with each other "on a handshake." *Id.*

On January 14, 2013, Mr. Uzzi sent Mr. Schwed an email advising, *inter alia*, that Binson had reassured him that he was not in possession of any additional relevant documents. Schwed Decl. Ex. F.  To drive the point home, Mr. Uzzi reiterated, "To be clear, Mr. Binson has not withheld any documentation from discovery and his response as to any requests for same is NONE EXIST." *Id.*

According to Defendant's counsel, Plaintiffs "repeatedly insisted" in the four months following Mr. Uzzi's January 14, 2013 email that no other responsive documents existed. Schwed Decl. ¶ 3.

In his May 19, 2013 deposition,[7] Binson testified as to Plaintiffs' recordkeeping practices.  Binson testified that he does not dispose of business records:  "Nothing is thrown out. I'm saying moved from one file to the other file, but nothing's thrown out."  Binson Tr. 49:10-12.  He testified that he had searched his records for these documents, and that the documents

---

[7] Defendant details the "liberties" Plaintiffs took with respect to the scheduling of Jacob Binson's deposition.  Def. Mem. L. 4.  Defendant contends that Binson's deposition was delayed six months because, *inter alia*, Plaintiffs and their counsel "unilaterally adjourned" the deposition without explanation in November 2012 and informed Defendant's counsel in January 2013 that they could not schedule the deposition at that time because Binson's son had contracted a serious illness.  *Id.* at 5.

were the only responsive documents he found.  *Id.* 13:10.  However, when presented with a January 14, 2013 email in which his counsel represented that Binson did not possess any additional documents of relevance,[8] Binson testified that this was an incorrect statement.  *Id.* at 15:10 – 15:22.  Binson clarified that he did tell Mr. Uzzi at the time of the January 14, 2013 email that he did not possess any other responsive documents, *id.* at 16:10 – 16:13; however, Binson did not conduct a search of his records at the time to confirm that this was the case.  *Id.* at 17:1 – 17:4.  Binson then acknowledged, "I do have a few paperwork on it," but he did not make clear what—if any—responsive documents he had in his possession.  *Id.* at 15:11 – 15:24.

During the deposition, Binson also referenced a February 2012 burglary of his offices and his son's paralysis as a result of a car accident in November or December 2012 as reasons for his failure to retain or produce certain records.  *See id.* at 59:23 – 59:24, 60:6 – 60:9.  According to Binson, "I had all of [the purchase orders relating to Binson Pawnbrokers' gold purchases] kept before I had a burglary . . . . They just destroyed everything.  I had a burglar.  Thank God they didn't touch the safe, but whatever was in the store – I own a jewelry store, too, and they stole over four and a half million dollar merchandise.[9]  I had everything in the books."  *Id.* at 26:8 – 26:19.  According to Binson, he was unable to produce certain documents because "[e]verything was in the chaos" after the burglary.  *Id.* at 57:12 – 57:24.

With respect to the Invoice, Binson testified that he first saw the document when he visited Defendant's office on August 10, 2011, and repeatedly denied having received the Invoice on November 8, 2010.  *Id.* at 107:3 – 107:17.  When asked to confirm that he had never seen the Invoice before August 2011 even though it was dated November 5, 2010, Binson stated,

---

[8] *See* Schwed Decl. Ex. F.

[9] Plaintiffs have not provided any evidentiary support for the claim that they were victims of a $4.5 million robbery.

"That's right.  I never saw it.  Never send it to me or anything."  *Id.* at 107:21 – 108:5.  After Mr.

Schwed again asked when Binson received the Invoice, Binson replied, "Are you on drugs or

dumb?  I told you it was August 11, 2011."[10]  *Id.* at 108:10 – 108:13.[11]  Binson also testified that

he thought he had a copy of the original version of the Invoice in his office, and promised to

produce it if he did.  *Id.* at 108:6 – 108:9, 109:9 – 109:11, 110:10 – 110:13, 115:15 – 116:3,

138:3 – 138:8.

Following the deposition, in a June 13, 2013 email to Mr. Schwed, Mr. Uzzi advised that

"Mr. Binson has not yet located the [original version] – at this point it is lost."  Supp. Schwed

Decl. Ex. I.

In a November 5, 2013 affirmation submitted in opposition to the instant motion, Binson

stated that he conducted a thorough review of his records in order to comply with Defendant's

discovery requests and observed his sons—who also work at Binson Pawnbrokers—double-

check his records.  Binson Aff. ¶ 5.  According to Binson, as of the date of the affirmation, he

had produced all of the documents and records that these searches found, and the copy of the

invoice that he had previously produced to Defendant "is identical to the way I found it and also

the way it was received from Defendant."  *Id.* ¶¶ 6, 8.[12]  As far as his general course of dealings

with Defendant, Binson noted that the parties cultivated a 15-year relationship that he viewed as

a "verbal handshake business relationship."  *Id.* ¶ 2.  Finally, whereas Binson said in his

deposition that he provided Mr. Uzzi with information from his business records in order to

---

[10] Binson could not recall in his deposition whether he visited Defendant's office on August 10 or August 11, 2011.
*See* Binson Tr. 107:15 – 107:17; 108:10 – 108:13.  Plaintiffs allege in the Complaint that the visit took place on
August 10, 2011.  Compl. ¶ 9.

[11] Binson stated that he may have received a fax from Weinstein on November 8, 2010, but that it would have
concerned the sale of 93.3 ounces of gold, not the remainder of the gold.  Binson Tr. 114:8 – 115:5.

[12] Mr. Uzzi has similarly declared that he made sure Binson searched for business records and documents relating to
the subject transaction, and that Plaintiffs produced what they found from this search.  Uzzi Decl. ¶ 3, Doc. 24.

facilitate the preparation of the Complaint, Binson Tr. 77:4 – 77:10, Binson stated in the affirmation that he did not review any documents, including "a document containing the alleged fax heading when preparing the Complaint."  Binson Aff. ¶ 9.

## III.   Defendant's Motion

Defendant argues that Plaintiffs' destruction of the Invoice and failure to search for or produce related business records warrant an adverse inference instruction as follows:  (1) if the Invoice had been produced by Binson, it would have contained transmittal information at the top of the document showing that it was faxed by Defendant to Plaintiffs on November 8, 2010; (2) Binson received and saw the Invoice on November 8, 2010; and (3) if Binson had produced business records relating to the transaction, they would have reflected the November 5, 2010 sale of gold to Defendant.  Def. Mem. L. 2.  Defendant further requests that the Court order that Plaintiffs and their counsel pay to Defendant all reasonable expenses, including attorney's fees, caused by Plaintiffs' spoliation and failure to comply with discovery obligations.  *Id.*

## IV.   Discussion

### a)   *The Standard*

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). The court's authority to impose sanctions for spoliation comes from the Federal Rules of Civil Procedure and the court's inherent powers.  *Port Auth. Police Asian Jade Soc. of N.Y. & N.J. Inc. v. Port. Auth.*, 601 F. Supp. 2d 566, 569 (S.D.N.Y. 2009) (citing *West*, 167 F.3d at 779).  "Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses and for the spoliation of evidence." *Reilly v. Natwest Mkts. Grp. Inc.*,

181 F.3d 253, 267 (2d Cir. 1999) (internal citation omitted); *see also Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001), *cert. denied*, 534 U.S. 891 (2001) (noting that the determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the court, and assessed on a case-by-case basis); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 219 (S.D.N.Y. 2003) ("There are no specific requirements for the imposition of sanctions under Rule 37; rather, the decision is left to the sound discretion of the trial court.").

An adverse inference instruction is "an extreme sanction and should not be given lightly." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("*Zubulake IV*"). A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Chin v. Port Auth.*, 685 F.3d 135, 162 (2d Cir. 2012) (quoting *Res. Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). In *Kronisch v. United States*, the Second Circuit established that a party's obligation to preserve evidence arises when it has notice that the evidence is relevant to litigation. 150 F.3d 112, 126 (2d Cir. 1998). Notice occurs "most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Id.*

Once a party's obligation to preserve evidence has been established, the court must evaluate the "culpable state of mind" of the party against whom the adverse inference is sought.

10

Spoliation sanctions are not limited to cases where the evidence was destroyed willfully or in bad faith, but may also be imposed when a party negligently loses or destroys evidence. *Adorno v. Port Auth.*, 258 F.R.D. 217, 227 (S.D.N.Y. 2009) (citing *Zubulake IV*, 220 F.R.D. at 220); *see also Glover v. Costco Wholesale Corp.*, 153 F. App'x 774, 776 (2d Cir. 2005) (summary order) (noting that the culpability requirement is satisfied by a showing that the evidence was destroyed either knowingly or negligently).

With respect to the third prong, the Second Circuit has made clear that "'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Res. Funding*, 306 F.3d at 108-09. Instead, the movant must adduce sufficient evidence from which a reasonable trier of fact could infer that the evidence in question "would have been of the nature alleged by the party affected by its destruction." *Kronisch*, 150 F.3d at 127. However, the Second Circuit has noted that courts must "take care not to 'hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence'" out of caution that the opposing party should not profit from the destruction of the evidence. *Res. Funding*, 306 F.3d at 109 (quoting *Kronisch*, 150 F.3d at 128).

Under the framework set forth by the Second Circuit, the showing of relevance required to satisfy the third prong depends on the nature of the opposing party's culpability. If evidence is found to have been destroyed in bad faith, that alone is sufficient circumstantial evidence from which a reasonable trier of fact could conclude that the missing evidence was unfavorable to the party against whom sanctions are sought. *Id.* at 109. Similarly, in certain circumstances, a showing of gross negligence will support the same inference. *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 439 (S.D.N.Y. 2010).

11

In the absence of bad faith or gross negligence, the court cannot infer that the evidence would have been harmful to the party accused of spoliation. *Id.* (citing *Zubulake IV*, 220 F.R.D. at 221). When the evidence is found to have been destroyed through ordinary negligence, the party seeking sanctions must instead prove through the introduction of extrinsic evidence that the evidence in question was relevant. *See Usavage v. Port Auth.*, 932 F. Supp. 2d 575, 590 (S.D.N.Y. 2013); *Adorno*, 258 F.R.D. at 229. In the context of a request for an adverse inference instruction, the concept of "relevance" encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) ("*Zubulake V*").

  b) *Destruction of The Invoice*

As an initial matter, Plaintiffs flatly deny that they ever had in their possession a November 5, 2010 invoice bearing a November 8, 2010 fax time stamp, and thus, argue that they cannot be held responsible for destroying a document they never possessed. It is well-established in the Second Circuit that the party seeking sanctions for spoliation must prove as an initial step that the evidence in question existed and was lost or destroyed. *See, e.g.*, *Farella v. City of New York*, No. 05 Civ. 5711 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007) ("[F]or sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence *actually existed and was destroyed*." (emphasis in original)). Courts in this Circuit have routinely denied motions for sanctions where the movant failed to establish that the evidence in question actually existed. *See, e.g.*, *Alaimo v. Trans World Airlines, Inc.*, No. 00 Civ. 3906 (GBD), 2005 WL 267558, at *3 (S.D.N.Y. Feb. 3, 2005) (stating that there could be no finding of spoliation of evidence because the plaintiff did not establish that the records and documents she sought ever existed); *Adato v. Gala Tour, Inc.*, No. 07 Civ. 4029 (KAM), 2011

12

WL 4458852, at *9 (E.D.N.Y. Sept. 23, 2011) (denying motion for sanctions because plaintiffs failed to prove that a logbook entry pertaining to an injury ever existed, let alone that it had been destroyed).

At this juncture, there is insufficient evidence upon which the Court can rely to conclusively establish that the Invoice was, in fact, faxed to Plaintiffs on November 8, 2010. While Defendant has provided evidence in the form of telephone records that are *consistent* with its version of events, those records only establish that *a* fax was sent; the records do not establish that the fax sent was the Invoice at issue here. And, as noted, Defendant has not offered a fax confirmation sheet which shows that the document faxed on November 8, 2010 was the Invoice. In order to rule in favor of Defendant, therefore, the Court would also have to find that Binson's deposition testimony that he did not receive the fax on November 8, 2010 was not credible. The Court cannot make that important credibility determination on the basis of the cold record before it. Thus, judgment on the issue of spoliation will be reserved until trial.

Courts in this Circuit have reserved judgment on sanctions motions on the basis of an undeveloped record. For example, in *Cohalan v. Genie Industries, Inc.*, No. 10 Civ. 2415 (JMF), 2013 WL 829150, at *9 (S.D.N.Y. Mar. 1, 2013), the court reserved judgment in a personal injury action where the defendant manufacturer of equipment involved in plaintiff's injury moved for sanctions against plaintiff's employer, the impleaded third-party defendant. After noting that the determination of whether to award sanctions for spoliation is a highly fact-specific inquiry, the court decided to defer the question of whether an adverse inference was appropriate until trial. *Id.* (quoting *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 294 (S.D.N.Y. 2011)). The court stated that at trial it would be in a better position to assess what prejudice, if any, was suffered as a result of the destruction of the

13

equipment, and whether other evidence could serve as an adequate substitute for the equipment. *Id.*; *see also Shrenuj USA, LLC v. Rosenthal & Rosenthal, Inc.*, No. 12 Civ. 4827 (JMF), 2014 WL 1226469, at *9 (S.D.N.Y. Mar. 25, 2014) (stating that the court would be in a better position to engage in the fact-specific inquiry involved in ruling on sanctions motion after hearing the evidence at trial); *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 494 (S.D.N.Y. 2010), *aff'd*, 694 F.3d 208 (2d Cir. 2012) (noting that the court heard oral argument on motion for adverse inference before trial testimony began and decided to reserve judgment in order to provide the parties with the opportunity to present additional evidence at trial).

   c)   *Plaintiffs' Refusal to Search for or Produce Business Records*

   Defendant further argues that Binson's "blatant refusal" to even search through his records for relevant documents—including ledgers and other accounting or bookkeeping records—mandates the imposition of sanctions pursuant to Rule 37 and the Court's inherent powers.  Def. Mem. L. 9-10.  In particular, Defendant requests an adverse inference that if such records had been produced, they would have contained details of Plaintiffs' November 5, 2010 sale of gold to Defendant.  *Id.* at 10.  In response, Plaintiffs contend that they searched their documents and business records "multiple times," and therefore that sanctions relating to the business records are therefore unwarranted.  Pls. Opp. Mem. L. 18, Doc. 26.

   As the Second Circuit made clear in *Residential Funding*, just as the intentional or grossly negligent destruction of evidence can support an inference that the evidence was harmful to the destroying party, so too can intentional or grossly negligent acts that hinder discovery. 306 F.3d at 110.  This is true "even *if* those acts are not ultimately responsible for the unavailability of the evidence."  *Id.* (emphasis in original).  Here, however, it is unclear whether the business records identified by Defendant were destroyed or lost.

14

Binson has affirmed that he and his sons conducted a thorough review of his records, and that as of November 5, 2013, he had produced all of the documents and records found in the searches. Binson Aff. ¶¶ 5, 6. His counsel stated that he "made sure" Binson searched his records and produced any documents of relevance. *See* Uzzi Decl. ¶ 3. However, Binson also testified that his search efforts were hampered by his son's serious illness and by a $4.5 million robbery of his business, which left his records in chaos. Thus, assuming Defendant can establish that the requested records existed, the question arises as to whether they were lost, withheld or destroyed innocently, negligently or willfully. Without this information and other details concerning Plaintiffs' efforts, the Court cannot know whether sanctions are warranted or which form of sanctions would be most appropriate. The Court expects that these details will come out at trial. Accordingly, on this issue as well, the Court will reserve judgment as to whether an adverse inference instruction is appropriate. *Cf. Cohalan*, 2013 WL 829150, at *9.

## V.   Conclusion

For the reasons set forth above, the Court reserves judgment on the motion. The Clerk of the Court is respectfully directed to terminate the motion (Doc. 19).

It is SO ORDERED.

Dated:   September 30, 2014
         New York, New York

Edgardo Ramos, U.S.D.J.